MAYOR AND BOARD OF ALDERMEN OF TOWN OF HICKORY
v. SEMMES ET AL.

[86 South. 272. In Banc, No. 21200.]

1. TRIAL. *Instruction not supported by evidence is error.*
   It is error to give an instruction to the jury not based upon the
   testimony.

2. CONTRACTS. *Evidence held insufficient to authorize instruction that
   evidence showed acceptance of heating plant.*
   Under the terms of a contract providing that heating plant must
   easily heat a building to a certain temperature, which contract
   and guaranty is for the duration of one year, and where the
   testimony shows that the plant on the first test operated success-
   fully, and that the agent of the purchasers of the plant at that
   time believed the plant complied with the contract and accepted
   it, but there was no waiver of the terms of the contract that the
   plant should successfully do this for a period of one year, an in-
   struction was erroneous which warranted the jury in believing
   that the plant was accepted immediately after this first test.
   This testimony would only warrant the jury in believing that the
   plant properly heated the building upon the first test.

APPEAL from circuit court of Lauderdale county.
HON. R. W. HEIDELBERG, Judge.

Action by the Mayor and Board of Aldermen of the
Town of Hickory against J. H. Semmes and others. Judg-
ment for defendants, and plaintiffs appeal. Reversed and
remanded.

*W. M. Everett, Jacobson & Brooks,* and *G. G. Lyell,* for
appellants.

*F. V. Brahan,* for appellees.

SYKES, J., delivered the opinion of the court.

The mayor and board of aldermen of the town of Hick-
ory, appellants in this court, instituted suit in the circuit

court against the appellees, defendants in the lower court, for damages for breach of a written contract relating to a heating plant installed in the schoolhouse of appellants at Hickory, Miss.

The appellees were awarded the contract for the building of a schoolhouse and the installment of a heating plant. That part of the contract alleged to have been breached is as follows:

"Contractor must install complete a hot air heating plant.   The furnace to be located in the basement on a concrete foundation and to be a heavy duty cast-iron furnace inclosed in a sheet metal jacket.

"To be of an approved make equal to and of such size as to easily heat the building to the required guaranty and to be connected to stack with a black iron pipe riveted together and set in a substantial manner.   All to have dampers and to be painted.

"Each room, cloak room, auditorium, office, music room, hall and the entire building to be heated and to have separate pipes and registers of such size and number to heat the entire building and each room to seventy degrees F. when the outside temperature is 10 degrees F. above zero.   .   .

.   .   .

"Said guaranty will be for one year from date of completion and acceptance."

The schoolhouse was built and a heating plant installed. Before the payment of the entire contract price a controversy arose between the contractors and the town as to whether or not the heating plant complied with  the above terms of the contract, and before the appellants would pay the last installment due under the contract they received another guaranty from the appellees reading as follows:

"We guarantee the heating in Hickory school building as per specifications prepared by P. J. Krouse, architect."

The testimony for the appellants in the case showed that the furnace was fired by students of the school in accord-

ance with the directions of the appellees and their agents as to the proper manner in which to fire the same, and that at no time were these firemen able to properly heat the rooms of the building in accordance with the terms of the contract; that at various and sundry times when the weather was warmer than ten degrees Fahrenhit above zero tests were made by trustees of the school, and that at no time was the building comfortably heated, or heated a temperature of seventy degrees Fahrenheit; that the building was uncomfortably cold for the teachers and pupils, and that on cold days it was necessary quite frequently to suspend school because of the failure to heat the building. That complaints were made to *the appellees, and they failed to remedy the defect in the heating plant; that after several notices were given to appellees the appellants removed the heating plant, and installed a new plant at a cost of something like one thousand dollars.

The testimony for the appellees was to the effect that they installed a heater in the building manufactured by a reputable concern; that upon the completion of the building the heating apparatus was tested for two days, and that this test was satisfactory to the agents of the appellants; that when these tests were made the thermometer was never any lower than fifteen degrees Fahrenheit above zero. That this temperature was reached in the morning and it was warmer during the day. During this test some of the rooms were heated to seventy or seventy-two degrees Fahrenheit, and some to about sixty-eight degrees Fahrenheit. It also appears that the heat in one or two of the rooms was cut off during this test; that the average temperature in the rooms that were heated was about sixty-eight degrees Fahrenheit. It is testified to by the appellees that after this test was made this agent of the appellants accepted the building. During the controversy the appellees sent a man to Hickory, who made some repairs on the furnace, and that at another time they sent a negro man to Hickory, who operated the furnace for about two

weeks. This negro testified that no complaints were made to him while he operated the furnace, and that the building was comfortably heated. However, he does not know what temperature was attained in the rooms of the school building, as he used no thermometer. His testimony as to the complaints and the heat of the building is contradicted by the witnesses for the appellants. The appellees also introduced testimony to the effect that the reason that the proper temperature was not reached when the furnace was operated by the students was because of the improper firing of the furnace, that the fire was banked too high, and ashes permitted unduly to accumulate. The testimony for the appellees further showed that there was an agreement entered into between the agent of the appellants and appellees to install a steel heating furnace in the schoolhouse, instead of the one called for in the contract.

Under the pleadings and testimony in the case the narrow question which should have been submitted to the jury was whether or not the heating appliance installed in the building was of an approved make, and of such size as to easily heat the rooms of the building to a temperature of seventy degrees Fahrenheit when the outside temperature was ten degrees Fahrenheit above zero, and continue to do this for a period of one year, when the furnace was properly operated by the appellees.

The second instruction given for the appellees was as follows:

"If the jury believe from the evidence that the defendants agreed on installing a steel heating furnace in lieu of a cast-iron furnace, and waived that part of the specifications, and that the defendants sent the plans and specifications of the building and heater to the Hess Heating and Manufacturing Company, and if the jury believe from the evidence it was a reputable heating company, and that the company manufactured and delivered the heater to defendants as a proper and suitable heater to be installed in the building in accordance with the plans and specifications of the building and the chanbed specifications of the

building through Dr. Williamson, and that the defendants in good faith purchased and installed the said heater and tested it in the presence of Dr. Williamson, and that the heater registered seventy or seventy-two degrees Fahrenheit on the inside of the building when the weather was ten degrees above zero on the outside, and that Dr. Williamson accepted the building and heater on behalf of the plaintiffs, and that said furnace when properly handled would heat said building to seventy degrees Fahrenheit when the outside temperature was as low as ten degrees, and the plaintiffs paid the defendants the full contract price for the building and heater, then the jury will find for the defendants."

There is a great deal of surplusage in this instruction, which surplusage should have been omitted. The fact that the company manufactured and delivered the heater to the defendants as a proper and suitable heater to be installed in the building, and that the defendants in good faith purchased the heater, is not material in this controversy. That part of the instruction relating to the test in the presence of Dr. Williamson is erroneous for the reason that the outside temperature was not ten degrees above zero Fahrenheit when the test was made, neither was the temperature of seventy degrees Fahrenheit above zero reached in all of the rooms of the schoolhouse during the test. In fact no test was made by either the appellants or the appellees when the outside temperature was as cold as ten degrees Fahrenheit above zero. This instruction is further misleading in stating that Dr. Williamson accepted the building and heater on behalf of the plaintiffs. It may be true that Dr. Williamson was satisfied that the building was properly heated on the test made, but there is no testimony to show that Dr. Williamson either finally accepted the heater as being satisfactory and complying with the contract, or that he had the right to waive the terms of the contract and to finally accept the heater. The testimony taken on this subject was merely to the effect that Dr. Williamson was satisfied with the first test made. There was

no change in the contract that this heating apparatus must properly heat the building in accordance with the contract for a period of one year.

*Reversed and remanded.*